IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

THOMAS MOORE, INDIVIDUALLY
AND ON BEHALF OF ALL WRONGFUL
DEATH BENEFICIARIES AND HEIRS AT
LAW OF CHARLES MOORE, DECEASED

THELMA COLLINS, INDIVIDUALLY
AND ON BEHALF OF ALL WRONGFUL
DEATH BENEFICIARIES AND HEIRS AT
LAW OF HENRY DEE, DECEASED                                    PLAINTIFFS

V.                                             CIVIL ACTION NO. 3:09CV236-TSL-FKB

FRANKLIN COUNTY, MISSISSIPPI                                  DEFENDANT

---

**FRANKLIN COUNTY, MISSISSIPPI'S REPLY TO THE PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW the Defendant, Franklin County, Mississippi, and offers this Reply to the Plaintiffs' Response in Opposition to Motion for Summary Judgment, further stating as follows:

In their Response to the Motion for Summary Judgment ("Response"), the Plaintiffs rely on unasserted claims, unsupported (or improperly supported) factual allegations, and a general mischaracterization of the Defendant's arguments.  In mischaracterizing the Defendant's "main arguments" as "at war with each other," the Plaintiffs ignore their own duplicity in disputing the application of the statute of limitations, while at the same time relying on information possessed prior to 2005 as the purported bases for their allegations.

Through this Reply, the Defendant will clarify how the claims asserted fail on the merits. In addition, the Defendant will spell out how all of the Plaintiffs' claims asserted are barred by the statute of limitations.  The absolutely unavoidable results of such analyses are that the Defendant is entitled to judgment as a matter of law and the Plaintiffs claims must be dismissed.

## I. UNDISPUTED MATERIAL FACTS REMAIN.

As support for their Response, the Plaintiffs attach as Exhibit 1, a "Statement of Facts." A comparison of pleadings reveals that Exhibit 1 contains "facts" which are at odds with the representations in the Plaintiffs' recent attempt to amend the operative Complaint.  In addition, many of the asserted facts are without appropriate evidentiary support.  The Defendant has filed a separate motion to strike the specifically objectionable allegations asserted in Exhibit 1, incorporated herein by reference.  (See the Defendant's Motion to Strike Exhibits Offered by the Plaintiffs in Response to Defendant's Motion for Summary Judgment).

## II. THE DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS.

Despite the arguments and facts alleged by the Plaintiffs, there exists no genuine issue of material fact in this matter.  The Plaintiffs have not properly alleged or supported any independent claims.  Moreover, the claims asserted on behalf of the decedents fail due to an absence of necessary factual support – allegations notwithstanding.  Regardless, the statute of limitations bars the Plaintiffs' claims, rendering summary judgment appropriate and wanting.

### A. The Plaintiffs Have No Cause of Action for Deprivation of Familial Relationships.

The only claim the Plaintiffs allege in their individual capacities is for deprivation of their "constitutional rights … to enjoy a familial relationship with their loved ones."  (See Complaint, Doc. No. 1 on ECF System, at ¶¶ 121-24).  In their Response, the Plaintiffs appear to argue that Fifth Circuit precedent recognizes a separate cause of action for the deprivation of their right to a familial relationship with the decedents.  However, the Fifth Circuit has **only** recognized the Plaintiffs' standing to seek recovery for injuries they suffered through the alleged "deprivation of [the decedents'] constitutionally secured liberty interests."  *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992); *see Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996) (discussing

right to sue for survivor's injuries from deprivation of decedent's constitutional rights); *Grandstaff v. Borger*, 767 F.2d 161, 172 (5th Cir. 1985) (recognizing standing to sue for own injuries in wrongful death of relative, but denying constitutional "bystander" cause of action).

The Plaintiffs also cite to *Trujillo v. Bd. of County Commissioners*, 768 F.2d 1186 (10th Cir. 1985) to support their argued recognition of an actionable right to familial associations in the wrongful death context. *Trujillo*'s recognition of rights and corresponding analysis has never been adopted by the Fifth Circuit. In addition, *Trujillo* requires – as part of its analysis – an allegation of specific intent to deprive a plaintiff of his/her right to a familial relationship. *Trujillo v. Bd. of County Commissioners*, 768 F.2d 1186, 1190 (10th Cir. 1985). No such allegation has ever been made in this case. (See Complaint, Doc. No. 1 on ECF System; First Draft of Proposed Amended Complaint, Doc. No. 215-2 on ECF System; Second Draft of Proposed Amended Complaint, Doc. No. 220 on ECF System; and the Response). Thus, while the Plaintiffs generally have standing to bring this action, they have no independent claim for the alleged deprivation of their familial relationships.

**B. The Plaintiffs Have No Viable Cause of Action for Deprivation of Access to Courts.**

It is improper for the Plaintiffs to act as if they have alleged a personal deprivation of their right(s) to access to the courts in the operative Complaint. The Plaintiffs only recently filed a Motion for Leave to Amend Their Complaint that seeks to add such a claim. (See Response to Motion for Leave, Doc. No. 223 on ECF System). The operative Complaint complains of the decedents' lost access to the courts, but not that of the Plaintiffs. (See Response to Motion for Leave, Doc. No. 223 on ECF System). The only "personal" claim the Plaintiffs alleged in that Complaint is the derivative claim for lost rights to familial relationships. (See Complaint, Doc. No. 1 on ECF System, at ¶¶ 112-114 and 122-24).

In their original Complaint, the Plaintiffs make clear that the alleged deprivation centered on Franklin County's alleged aid in a Ku Klux Klan campaign to deny <u>equal</u> access to the courts through cover-ups and refusals "to prosecute crimes committed by the Klan."  (See Complaint, Doc. No. 1 on ECF System, at ¶¶ 27-28).  At no point have the Plaintiffs alleged interference with the prosecution of civil actions.  (See Complaint, Doc. No. 1 on ECF System; First Draft of Proposed Amended Complaint, Doc. No. 215-2 on ECF System; Second Draft of Proposed Amended Complaint, Doc. No. 220 on ECF System; and the Response).  Now, in their Response – and for the first time in this litigation – the Plaintiffs indicate that the "access to courts" claim is predicated upon authorities recognizing a cause of action for interference with civil suits.

Such a claim should be denied on several independent bases.  First, it is clear from review of the Response that the Plaintiffs have abandoned the "access to courts" claim brought on behalf of the decedents.  Accordingly, the Defendant reiterates the arguments asserted in its Motion for Summary Judgment that no such constitutional deprivation could have been visited upon the decedents.  *See Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979) (events occurring post-*obitum* cannot form part of deceased's action for constitutional violations).  Further, the Defendant again objects to the very implication that the Plaintiffs may now raise an "access to courts" claim on their own behalf.

The Plaintiffs have never alleged that the Defendant has interfered with an available civil remedy.  The only fair reading of any actual or suggested version of the operative Complaint demonstrates allegations that the decedents were denied access to criminal justice.  That claim is not cognizable, as "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Oliver*

*v. Collins*, 904 F.2d 278, 281 (5th Cir.1990) (decisions to file/not file charges do not give rise to liability). Thus, the claim actually alleged is not legally viable – regardless of who presents it.

Regardless, a more fundamental basis exists to deny this new claim – if allowed. The simple fact is that while the Plaintiffs have offered citation to authorities, they have still never levied a single factual allegation to the effect that the Defendant has interfered with any effort(s) to seek civil damages. No such allegations are found in any version of any Complaint in this matter or in the Plaintiff's Response. Also, the Plaintiffs cannot prove such a claim, as decisions concerning any response to these crimes were left to elder family members; and the Plaintiffs cannot demonstrate the extent of those family members' knowledge.[1] In addition, the Plaintiffs testified that the only manner in which they personally felt damaged was through a lack of information during the investigation.[2] Thus, the Defendant is entitled to judgment as a matter of law as to this claim of deprivation of access to courts.

### C.  The Plaintiffs Find No Refuge in the State-Created Danger Theory.

The Plaintiffs continue to rely upon the alleged failure of Sheriff Hutto and/or Deputy Shell to take adequate steps to protect Dee and Moore as the basis for both their due process and equal protection claims. In doing so, and without using the terminology, the Plaintiffs are seeking to demonstrate a constitutional violation through a "state-created danger" theory.

---

[1] Mr. Moore testified at his deposition: "You know, we're talking about something I don't even know whether Mazie Moore knew about. I don't know whether she knew what happened on that Saturday with them searching the church. I don't know. She never told me. She never told me." (See Exhibit "E" to Motion for Summary Judgment, Moore Deposition, at p. 188). At her deposition, Ms. Collins testified that her aunt, Josephine Hunt, was taking care of such matters and that Ms. Collins did not know the extent of her knowledge or efforts. (See Exhibit "K" to Motion for Summary Judgment, Collins Deposition, at pp. 36-37).

[2] Ms. Collins testified: "I don't really know who to sue, me. All I know, somebody could have give us more information or more direction about what went on and what happened, and we didn't get that." (See Exhibit "K" to Motion for Summary Judgment, at p. 35). Mr. Moore was asked: "[I]t is your contention that it was the failure of Sheriff Hutto's office to investigate the disappearance of your brother that demonstrates the constitutional violation; is that correct?" (See Exhibit "E" to Motion for Summary Judgment, at p. 186). He responded: "That's absolutely correct… What I'm saying, this -- to not -- after Mama went and put Charles Moore and Henry Dee missing, and then there was not a follow-up to my knowledge, of Wayne Hutto or Kirby Shell." (See Exhibit "E" to Motion for Summary Judgment, at pp. 187-88).

However, the Fifth Circuit has **not** adopted the state-created danger theory as a viable means to relief under 42 U.S.C. § 1983.[3]  *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 466 (5th Cir. 2010); *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 553-55 (S.D. Miss. 2004) (this Court's confirmation that Fifth Circuit has not adopted theory);[4] *see also Doe v. Covington Cty. Sch. Dist.*, Civil Action No. 2:08cv204-KS-MTP, 2009 WL 1294351, at *2-3, n.4 (S.D. Miss. May 7, 2009) (examining Fifth Circuit treatment of theory prior to *Bustos*, noting Fifth Circuit has never affirmed liability on theory).  Regardless, as the Plaintiffs recognize that the kidnapping and murders of Dee and Moore were committed by private actors, they fail to demonstrate an actionable constitutional violation.[5]

Even assuming the viability of the state-created danger theory, the Plaintiffs have not presented evidence necessary to support a claim.  First, "liability [under the state-created danger theory] exists only if the state actor is aware of an **immediate danger** facing a **known victim**." *Lester v. City of College Station*, 103 Fed. Appx. 814, 814-16 (5th Cir. 2004) (emphasis added); *see also Morin v. Moore*, 309 F.3d 316, 322 (5th Cir. 2002) ("[t]he state actor's actual knowledge is critical to the inquiry").[6]  There is simply no proof in the record that, prior to the kidnapping, Sheriff Hutto and/or Deputy Shell – much less anyone – possessed a specific awareness that Henry Dee and/or Charles Moore faced such an immediate danger.  (See Exhibit

---

[3] Even those cases discussing the theory have only done so in the context of substantive due process secured through the Fourteenth Amendment – it has never been discussed as a theory applicable to other constitutional provisions. *C.f. Bynum v. City of Magee, Miss.*, 507 F. Supp. 2d 627, 632-35 (S.D. Miss. 2007).

[4] In *Bynum v. City of Magee, Mississippi*, this Court did find that the Fifth Circuit had recognized the state-created danger theory.  *See Bynum*, 507 F. Supp. 2d at 632.  The sole authority cited in support of this position – a reversal of ground from this Court's position in *Olivia Y.* – was the Fifth Circuit panel's opinion in *Breen v. Texas A&M Univ.*, 485 F.3d 325 (5th Cir. 2007).  It does not appear that this Court has been presented with an opportunity to revisit the issue following *Bynum*.  However, any recognition of the theory in *Breen* was rendered null and void when those specific portions of the opinion were withdrawn in a *per curiam* opinion which followed a *sua sponte* grant of rehearing geared toward the specific issue.  *Breen v. Texas A&M Univ.*, 494 F.2d 516, 518 (5th Cir. 2007).

[5] The Plaintiffs' citation (found on page 21 of their Response) to *Breen v. Texas A&M Univ.*, 485 F.3d 325, 332 (5th Cir. 2007) for the vaguely asserted constitutional requirement of protection is not appropriate.  *See* note 4.

[6] Even *Deshaney v. Winnebago County Dept. of Soc. Servs.*, upon which the state-created danger theory is based, restricts application of this line of thinking "to particular individuals."  *Deshaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 198 (1989).

1 to the Plaintiffs' Response).  Further, there is simply no proof in the record that, prior to the murders, Sheriff Hutto and/or Deputy Shell possessed a specific awareness that Henry Dee and/or Charles Moore – again, much less anyone – faced such an immediate danger.  (See Exhibit 1 to the Plaintiffs' Response).

Second, and even assuming the requisite specific awareness, the earliest specific involvement alleged against Sheriff Hutto or Deputy Shell – the search of the Roxie Baptist Church – follows the kidnapping and beating of Dee and Moore by private actors.  (See Exhibit 1 to the Plaintiffs' Response).  In fact, in Exhibit "8" to the Plaintiffs' Response, an FBI agent notes that it was not until **_after_** the kidnapping and beating of Dee and Moore that Marcus Edwards "was asked by Clyde Seale what he should do next.  Edwards suggested obtaining a search warrant for the church."[7]   (See Exhibit 8 to the Plaintiffs' Response).  In other words, even the idea of potentially involving law enforcement did not arise until after Dee and Moore had been placed in immediate danger by these private individuals.

Based upon the Plaintiffs' own objectionable exhibits, neither Hutto nor Shell can be said to have **_affirmatively placed_** Dee and Moore in danger, thus preventing liability.  *See Piotrowski v. City of Houston*, 237 F.3d 567, 584-85 (5th Cir. 2001) (cited hereafter in short form as *Piotrowski II)* (quoting *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)).[8] Along these same lines, there is no allegation of any action taken by Sheriff Hutto or Deputy Shell following the kidnapping which **_increased the immediate danger_** to Dee or Moore, also preventing liability.  *McClendon v. City of Columbia,* 305 F.3d 314, 322-23 (5th Cir. 2002); *Bynum v. City of Magee, Miss.*, 507 F. Supp. 2d 627, 632-35 (S.D. Miss. 2007) (decedent already

---

[7] Through this and other references, the Defendant does not intend to waive its objection(s) to Exhibit 1 (or any other Exhibits) of the Plaintiff's Response.

[8] The fact that Dee and Moore were not confined through "the affirmative exercise" of Sheriff Hutto's or Deputy Shell's power, nullifies any special relationship which might have otherwise initiated a duty of protection.  *See Walton v. Alexander*, 44 F.3d 1297, 1306 (5th Cir. 1995).

vulnerable at time of police involvement); *Olivia Y.*, 351 F. Supp. 2d at 555; *see also Lefall v. Dallas Ind. Sch. Dist.*, 28 F.3d 521, 530-31 (5th Cir. 1994) (liability may not rest on merely increasing danger).

Third, there is no allegation or proof that Sheriff Hutto or Deputy Shell took any action(s) – at any point in this ordeal – which affirmatively prevented Dee and Moore from either protecting themselves or from the receipt of private aid.   (See Exhibit 1 to the Plaintiffs' Response).  For this additional reason, the state-created danger theory, even if it was recognized in the Fifth Circuit, is inapplicable in this case.  *See Piotrowski II*, 237 F.3d 567 at 585; *Johnson*, 38 F.3d at 201.  Because of the absolute lack of proof that Sheriff Hutto or Deputy Shell "used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur," there is no evidence of a constitutional violation.  *See Piotrowski II*, 237 F.3d at 585; *Johnson*, 38 F.3d at 201.

### D.  The Plaintiffs Have Failed to Demonstrate County Liability.

The unavailability and inapplicability of the "state-created danger" theory is absolutely fatal to the Plaintiffs' attempt to hold the Defendant liable in this case.  It is axiomatic that 42 U.S.C. § 1983 simply provides a remedy for constitutional violations – it creates no substantive rights on its own.  *See Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989).  It follows, then, that since the Plaintiffs have failed to demonstrate a constitutional violation on the part of Sheriff Hutto or Deputy Shell, there is absolutely no basis upon which this Court may find the Defendant liable.  *See Bustos* 599 F.3d at 467-68.  The same result is achieved on further analysis, which is fatal to **all** of the Plaintiffs' claims.

Even assuming the viability of the state-created danger theory, and its applicability, such violations would not set the stage for this Court to impose liability upon the Defendant.  First,

8

even if Sheriff Hutto and/or Deputy Shell were found to have engaged in a constitutional violation, there is no *respondeat superior* or vicarious liability on the part of the Defendant. *See Piotrowski II*, 237 F.3d at 578 (5th Cir. 2001) (citing *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)). Accordingly, the Defendant may only be held liable if an official Franklin County policy or custom caused a violation of constitutional rights. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Piotrowski v. City of Houston*, 51 F.3d 512 (5th Cir. 1995) (cited hereafter in short form as *Piotrowski I*); *Bynum*, 507 F. Supp. 2d at 631. However, the Plaintiffs have failed to present any proof that any Franklin County policy or custom was the "moving force" behind the injuries at issue.

In their Response to the Defendant's Motion for Summary Judgment, the Plaintiffs allege – for the very first time (and without genuine supportive proof) – that Sheriff Hutto had enacted four improper policies that are relevant to the instant analysis:

(1) A policy to protect the Ku Klux Klan from criminal liability for lawless acts;[9]

(2) A policy to deprive black citizens of public protection against racial violence perpetrated by white citizens;[10]

(3) A policy to ignore the need to train law enforcement officers in the constitutional requirement that the law be enforced in a non-racially-discriminatory manner;[11] and

(4) A policy to cover up crimes of racial violence from investigation by other law enforcement agencies.[12]

---

[9] The Plaintiffs' purported police practices expert, James Merritt, could only cite to the original Complaint in support of the assertion underlying this purported policy. (See Exhibit "O" in support of Motion for Summary Judgment, at pp. 119-21).

[10] Per James Merritt, the assertion underlying this purported policy is supported only by newspaper articles which he found to be an unreliable source of information. (See Exhibit "O" in support of Motion for Summary Judgment, at pp. 118-19). In fact, he stated that his opinion – upon which this purported policy is based – was pure speculation and should not be considered. (See Exhibit "O" in support of Motion for Summary Judgment, at pp. 118-19).

[11] By the Plaintiffs' admission, this policy is not even contemplated in the Complaint. Further, minimum training standards were not even in place in Mississippi until the 1970's.

[12] Again, James Merritt could only cite to the original Complaint in support of the assertion underlying this purported policy. (See Exhibit "O" in support of Motion for Summary Judgment, at pp. 119-21).

(See the Plaintiffs' Response to the Motion for Summary Judgment, at p. 20).  Previously; however, their own expert, James Merritt testified that the only "policy" relevant to this action was the oath of office administered to Sheriff Hutto upon the assumption of his duties.  (See Portion of Deposition of James Merritt, attached as Exhibit "O" in support of Motion for Summary Judgment, at pp. 149-50).  The oath of office is unquestionably nothing more than a recitation of a clearly constitutional county policy and it cannot serve as a basis for this action.

Even assuming the existence of the above policies, the Plaintiffs have not presented genuine evidence that demonstrates that any of them was a "moving force" behind an injurious constitutional violation.  As previously noted, the Plaintiffs and/or decedents lack a cognizable interest in prosecutions or nonprosecutions of others.  *Linda R.S.*, 410 U.S. at 619; *Oliver*, 904 F.2d at 281.  It seems clear, then, that neither the first nor the fourth allegedly existing policies could have caused an actionable constitutional violation.  *See Bustos*, 599 F.3d at 467-68 (constitutional violation necessary for liability).

By their very nature, actual knowledge of impending danger to the decedents (at least actual knowledge of impending danger to black victims, if not their specific identity) would be necessary for either the second or third policies to have actually caused a constitutional violation in this case.  However, there is simply no evidence that indicates either Sheriff Hutto or Deputy Shell had such knowledge at a time when they could have intervened to save the decedents.  (See Exhibit 1 to the Plaintiff's Response).[13]  Moreover, there is absolutely no evidence that they

---

[13] While the Defendant does not accept the appropriateness or admissibility of the exhibit or its contents, the Plaintiffs have asserted the trial testimony of Marcus Edwards as probative of their claims.  (See Exhibit "3" to the Plaintiffs' Response, Edwards Testimony).  It is important to note that Marcus Edwards has never testified as to an organized plan to harm Henry Dee and he fully dismissed the idea of any pre-existing plan or conspiracy directed at Charles Moore, testifying that "[h]e was just the victim of circumstances. He wasn't after him." (See Exhibit "3" to the Plaintiffs' Response, at p. 1177-80).  Also, there is no testimony indicating that Deputy Shell was a party to any plan or conspiracy.  (See Exhibit "3" to the Plaintiffs' Response).  And, as concerns the vague testimony that Sheriff Hutto was "in the plan," the Plaintiffs concede that they have **no** knowledge – only a presumption – as to the actual substance of any such plan.  (See the Plaintiffs' Discovery Responses, attached as Exhibit "P" in support of the

could have successfully intervened to save the decedents.  (See Exhibit 1 to the Plaintiff's Response).  Further, there is no evidence to indicate that, assuming a constitutional violation, the training designated by the Plaintiffs would have prevented the occurrences at issue.  (See Exhibit 1 to the Plaintiff's Response).  There exists no evidence to demonstrate any constitutional violation caused by an official Franklin County policy or custom, and, thus, no basis for liability against the Defendant.  *See Monell*, 436 U.S. at 692; *Piotrowski II*, 237 F.2d 580.

In addition, for the Plaintiffs to prevail in regard to the third policy (essentially a failure to train), they must demonstrate that Sheriff Hutto enacted this policy with such "deliberate indifference" as to evidence a conscious "decision by [Sheriff Hutto] to violate the Constitution."[14]  *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir.1993) (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring)).  Because the Plaintiffs have "not demonstrated that [any such] decision reflected a conscious disregard for a high risk that [Deputy Shell] would" [act] in violation of [a] federally protected right," such a policy, even if proven cannot create liability against the Defendant.  *Board of County Commissioners of Bryan County*, 520 U.S. at 415-16.[15]

**E.  Unable to Support Claims Under 42 U.S.C. § 1983, the Plaintiffs' Other Claims Fail**.

The preceding two sections are also dispositive of any remaining claims not brought under 42 U.S.C. § 1983.  First, this Circuit does not recognize an independent cause of action under 42 U.S.C. § 1981 – such a claim may only be brought under 42 U.S.C. § 1983.  *See Felton v. Polles*, 315 F.3d 470, 482-83 (5th Cir. 2002).  Furthermore, while independent, the Plaintiffs'

---

Defendant's Motion for Summary Judgment).  Thus, there exists no actionable plan or conspiracy or, at minimum, one geared in any manner towards Charles Moore.

[14] At his deposition, James Merritt admitted that no evidence existed to place Sheriff Hutto at either the Franklin County Courthouse or the Roxie First Baptist Church on May 2, 1964.  (See Exhibit "O" in support of Motion for Summary Judgment, at pp. 45-46).  Thus, there is **no proof of any single act which might have served as a relevant policy**, much less a "moving force" behind the injuries at issue.

[15] Culpability "depend[s] on a finding that [Deputy Shell] was highly likely to inflict the particular injury suffered by the plaintiff."  *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 412 (1997).

claim under 42 U.S.C. § 1985(3) is necessarily resolved through the preceding analysis.  As with § 1983 claims, there is no *respondeat superior* liability for § 1985 claims.  *Owens v. Haas*, 601 F.2d 1242, 1247 (2nd Cir. 1979), *cert. denied, County of Nassau v. Owens*, 444 U.S. 980 (1979) (applying *Monell* to claims under 42 U.S.C. § 1985); *Green v. Tilley*, No. 2:04CV0819, 2006 WL 220847, at *3 (W.D. La. Jan. 23, 2006) *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998); *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994).  Hence, the Defendant's demonstration of how there exists no county liability under § 1983 also extinguishes any potential liability under § 1985.

### F.  The Statute of Limitations Ran on the Plaintiffs' Claims Long Ago.

*Statutes of limitations are intended to ensure fairness to defendants against claims that have been allowed to slumber, as the right to be free of stale claims in time comes to prevail over the right to prosecute them.*[16]

It is wholly improper for the Plaintiffs to treat the issue of the statute of limitations as *res judicata*.  While no party disputes that the applicable limitations period for the Plaintiffs' claims is three years, the suggestion that its application "has already been resolved by this [C]ourt" is intellectually dishonest.  This contention ignores both the guidelines for this Court's review of motions brought under Fed. R. Civ. P. 12(b)(6) and the Plaintiffs' recent admission to a lack of evidence supporting certain allegations upon which this Court relied in denying the referenced Motion to Dismiss.  (See Response to Motion for Leave, Doc. No. 223 on ECF System).  Now, with discovery concluded, the issue is again ripe for judgment as a matter of law.

While, the Plaintiffs' cause of action did not accrue until they could be held to have knowledge of their injuries and their connection to the Defendant's alleged actions, they were not entitled to the "leisurely discovery of the full details of the alleged scheme."  *Piotrowoski I*,

---

[16] *Jenson v. Snelling*, 841 F.2d 600, 607 (5th Cir. 1988); (quoting *Maxwell v. Swain*, 833 F.2d 1177, 1178 (5th Cir. 1987)).

51 F.3d at 516 (quoting *Stewart v. Parish of Jefferson*, 951 F.2d 681, 684 (5th Cir. 1992));

*Jenson v. Snelling*, 841 F.2d 600, 607 (5th Cir. 1988).  For the cause of action to accrue, and the

statute of limitations to begin to run, "[t]he plaintiffs need not have knowledge of fault in the

legal sense… but [they] must have knowledge of facts that would lead a reasonable person (a) to

conclude that there was a causal connection … or (b) to seek professional advice, and then, with

that advice, to conclude that there was a causal connection between the [defendant's acts] and

injury."  *Piotrowski I*, 51 F.3d at 516 (quoting *Harrison v. United States*, 708 F.2d 1023, 1027

(5th Cir. 1983));[17] *see also Adrian v. Selbe*, No. 09-30471, 2010 WL 517668, at *2 (5th Cir. Feb.

12, 2010); *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993) (causes of action accrue with

constructive knowledge).

   "Under federal law, the limitations period commences when 'the aggrieved party has

either knowledge of the violation or notice of facts which, in the exercise of due diligence, would

have led to actual knowledge' thereof."  *Jenson*, 841 F.2d at 606 (quoting *Vigman v. Community

Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981)).  This "diligent inquiry" requirement

"imposes an affirmative duty upon the potential plaintiff."  *Id.* at 607.  "A plaintiff who has

learned of facts which would cause a reasonable person to inquire further must proceed with a

reasonable and diligent investigation, and is charged with the knowledge of all facts such an

investigation would have disclosed."  *Id.*[18]

---

[17] "The knowledge, whether actual or constructive, which an aggrieved party must have for the purpose of commencing the running of a statute of limitations is merely that of 'the facts forming the basis of his cause of action' … not that of the existence of the cause of action itself."  *Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981).

[18] To the extent that the Plaintiffs rest further accrual argument on allegations of fraud, "the better reasoned rule is that an act of concealment should not relieve the plaintiff of his duty to exercise reasonable diligence to discover the fraud."  *Jenson v. Snelling*, 841 F.2d at 607.  Even "[w]hen a defendant controls the facts surrounding causation such that a reasonable person could not obtain the information even with a diligent investigation, a cause of action accrues, but the statute of limitations is tolled."  *Piotrowski II*, 237 F.3d at 577 n.13; *Piotrowski I*, 51 F.3d at 517.

Here, the purported bases of the Plaintiffs' own allegations prove that the Plaintiffs possessed actual or constructive knowledge of the "facts" upon which their claims are based well prior to the expiration of the limitations period in this case.  Once more, for the record, the Defendant vehemently objects to and wholeheartedly disputes the veracity of the accompanying assertions.  However, through offering a timeline to the Plaintiffs' allegations, the Defendant is merely attempting to demonstrate how, even if accepted as true, these very allegations prove actual and/or constructive knowledge which has allowed the statute of limitations to expire.

### *Allegations Based upon Information Known by the Plaintiffs in 1964*

• Henry Dee and Charles Moore disappeared on May 2, 1964.

• On May 5, 1964, Mazie Moore reported to Sheriff Hutto that Henry Dee and Charles Moore had been missing since May 2, 1964.

• On May 9, 1964, Sheriff Hutto reported to Mazie Moore that Henry Dee and Charles Moore were in Albany, Louisiana.

• After this report, Mazie Moore traveled to Albany, Louisiana, whereupon Thelma Collins reported that Henry Dee and Charles Moore were not and had never been in Albany, Louisiana.

• On May 16, 1964, members of Henry Dee's and Charles Moore's family, including Evie Bell-Shaw and Virginia Hunt, traveled to the Franklin County Sheriff's Department to report his disappearance, speaking with Deputy Shell.

• Neither Sheriff Hutto nor Deputy Shell provided the families of Henry Dee and/or Charles Moore with any information concerning the boys.

• The bodies of Dee and Moore were discovered on July 12, 1964.

• Neither Sheriff Hutto nor Deputy Shell made any contact with the families of Henry Dee and/or Charles Moore following the discovery of the bodies.

• On June 10, 1964, Burl Jones (a cousin of Henry Dee's) was arrested by Highway Patrolman Burnice Beasley and then held in the Franklin County Jail by Sheriff Hutto.[19]

---

[19] Plaintiff Thelma Collins knew of the allegations concerning Burl Jones and involving activity at the Franklin County Sheriff's Department back in the 1960's.  (See Excerpts from Deposition of Thelma Collins, attached as Exhibit "Q" in support of the Motion for Summary Judgment, at pp. 18-19).

- Burl Jones was held in the Franklin County Jail for a traffic violation for eleven (11) days.

- Upon release from the Franklin County Jail, and while still in the Franklin County Courthouse, Burl Jones was abducted by men wearing white hoods who drove him to the Homochitto National Forest and beat him severely.

- During the beating, Burl Jones was taunted with racial epithets and interrogated about black citizens' possible membership in the NAACP.

- No arrests were made in 1964 concerning Burl Jones' kidnapping and beating.

- On November 6, 1964 James Seale and Marcus Edwards were charged and arrested with the murders of Dee and Moore.

### *Allegations Based upon Information in the Public Domain No Later than 1965*[20]

- On May 2, 1964 (the same day Dee and Moore went missing), Deputy Shell searched the Roxie First Baptist Church for guns, along with members of a local unit of the White Knights of the Ku Klux Klan.[21]

- On January 11, 1965, the criminal charges against James Seale and Marcus Edwards were dropped.

- James Seale and Marcus Edwards were members of a local unit of the Ku Klux Klan.

- In 1963, James Seale arrested a black resident of Franklin County.

- Sheriff Hutto was a member of the local Ku Klux Klan.

- Mississippi Highway Patrol Officer Burnice Beasley was a member of the local Ku Klux Klan.

- Franklin County Constable Jack Davis was a member of the local Ku Klux Klan.

- Clyde Seale and Archie Prather were the two main Ku Klux Klan leaders in Franklin County.

- Local businesses which employed or catered to black citizens were burned down, bombed, and harassed by the White Knights of the Ku Klux Klan.

---

[20] This contention is based upon either statements or testimony from witnesses available in 1965, or statements reported as matters of hearsay and/or alleged common knowledge in the community at that time, or newspaper articles from the time.

[21] Though the Plaintiffs conveniently omit this information, the "Briggs Diary" connects Deputy Shell to the search of the Roxie First Baptist Church.  (See Exhibit "55" to the Plaintiffs' Response).  Clearly, then this knowledge was possessed by Reverend Clyde Briggs, who was available to – and pastored to – the Plaintiffs in 1964 and 1965.

- Sheriff Hutto did not control/prevent crimes or harassment by the White Knights of the Ku Klux Klan against local businesses which employed or catered to black citizens.

- Sheriff Hutto and Deputy Shell directed searches for white citizens, using one hundred-fifty to two hundred volunteers during 1964 and 1965, though the same efforts were not put towards searching for Dee and Moore.

- Sheriff Hutto assumed the role of Sheriff of Franklin County without any previous law enforcement experience.

- Deputy Shell assumed the role of Deputy Sheriff for Franklin County without any previous law enforcement experience.

- Black citizens in Franklin County could not depend on the law administered by white citizens to guard their rights.[22]

- Allegations based upon statements or testimony of the following individuals, who were present in Franklin County at this time: FBI agents, Rev. Clyde Briggs, Oscar Hughes, Jack Smith, Donald Butler, Marian King, Richard King, Frank C. Allen, Eddie Jones, Burl Jones, Robert Middleton, Ed Bennie Briggs, Chastity Middleton, Alton Halford, Max Graves, Warren Newman, and John Briggs.

### *Allegations Based upon Information in the "Briggs Diary" Located No later than 1984*[23]

- Rev. Clyde Briggs was the pastor of the Roxie First Baptist Church at the time it was searched on May 2, 1964.

- On May 24, 1964, Rev. Briggs and his son, Ed Bennie Briggs, were leaving a separate church in Bude when they were accosted by a group of white men (including Constable Jack Davis) who shouted racial epithets and attempted to pull Rev. Briggs over.

- Jack Davis threatened to kill Rev. Briggs on the evening of May 24, 1964.

- On July 13, 1964, after the discovery of Dee's and Moore's bodies, unidentified white men fired shots into the bedroom of Rev. Briggs' daughter.

- On August 10, 1964, a carload of white men fired shots into Rev. Briggs' home.

---

[22] Notably, this is considered a matter of history, as is demonstrated by the Plaintiffs' citation to their Mississippi history expert, Charles Eagles, as the basis for this allegation.

[23] These allegations are based on the purported diary of Clyde Briggs, which was rediscovered no later than 1980 (See Portions of Deposition of John Briggs, attached as Exhibit "R" in support of Motion for Summary Judgment, at pp. 39-40). Again, the "Briggs Diary" connects Deputy Shell to the search of the Roxie First Baptist Church. (See Exhibit "55" to the Plaintiffs' Response). Clearly, then, the alleged law enforcement involvement in the search was ascertainable no later than 1984.

### _Allegations Based upon Information Available No Later than the 1999 Release of House of Representative's Committee on Un-American Activities Files_[24]

- Two units of the WKKKK were present in Franklin County in 1964.

- James Seale's father, Clyde Seale (a member of Unit 2 of the Franklin County WKKKK), was the "Exalted Cyclops" of the Franklin County WKKKK.

- Franklin County was considered a "hotbed" of WKKKK activity.

- The FBI knew of Sheriff Hutto's WKKKK membership as early as July, 1965.

- The FBI knew of Burnice Beasley's WKKKK membership as early as July, 1965.

- Sheriff Hutto was suspected of passing sensitive investigative information to the WKKKK.

- After FBI and Miss. Highway Patrol investigators arrived in Franklin County in 1965 to investigate the death of Earl Hodges, Sheriff Hutto stated to his staff "to hell with the FBI and the Highway Patrol investigators – the Klan will be here a long time after they are gone."

### _Allegations Based upon Information Available No Later than 2000, when Thomas Moore Came into Possession of an Unredacted Eight-Page FBI Memorandum from 1965_[25]

- On May 2, 1964, Dee and Moore were picked up by James Seale and Clyde Seale just outside of Meadville on US Highway 84.

- James Seale took Dee and Moore and Dee to the Homochitto National Forest in Franklin County.

- James Seale was followed by other members of the Franklin County WKKKK, Marcus Edwards, Clyde Seale, and Archie Prather.

- At the forest, the men tied Dee and Moore to a tree and beat them.

- During the beatings, Dee and Moore were interrogated about racial agitation and potential violent black organizations bringing guns into the area.

- During the beatings, Dee and Moore identified Reverend Clyde Briggs and stated that guns were being stored at the Roxie Baptist Church.

---

[24] These allegations are based on "HUAC" materials that were available for public release in 1999 pursuant to the Freedom of Information Act.  _See_ 5 U.S.C. § 552.  At his deposition, Mr. Moore admitted to gaining actual possession of the subject documents in 2005.  (See Excerpts from Thomas Moore Deposition, attached as Exhibit "S" in support of Defendant's Motion for Summary Judgment, at pp. 66-68).

[25] At his deposition, Mr. Moore also admitted to gaining actual possession of these documents in 2000.  (See Excerpts from Thomas Moore Deposition, attached as Exhibit "S" in support of Defendant's Motion for Summary Judgment, at pp. 66-68).

- Subsequent to the beatings, Dee and Moore were tied to heavy objects, and, while alive, thrown into the river to drown.

***Allegations Based upon Information Available No Later than 2002, when the Mississippi Department of Archives and History provided an online full text version of the Mississippi Sovereignty Commission's files[26]***

- In 1964, Marian King met with Governor Paul Johnson and Miss. Highway Patrol official Charles Snodgrass to seek assistance with the Ku Klux Klan's destruction and harassment of her businesses.

- When Marian King met with Governor Johnson and Charles Snodgrass, she reported that Sheriff Hutto and Burnice Beasley were members of the Ku Klux Klan.

- When Marian King met with Governor Johnson and Charles Snodgrass, she also reported James Seale, Clyde Seale, Jack Davis, and Jack Seale were members of the Ku Klux Klan.

- When Marian King met with Governor Johnson and Charles Snodgrass, she reported that Sheriff Wayne Hutto was not effectively suppressing or preventing violent/destructive Ku Klux Klan activity.

***Allegations Based upon Information Possessed by the Plaintiffs Since July of 2005, when FBI files were Given to Thomas Moore, who Headed the Investigation for All Families[27]***

- On November 4, 1964, Franklin County District Attorney Lennox Forman told the FBI that Clyde Seale and James Seale had terrorized the Meadville community through unprovoked violence for the past few years.

- On the day of his arrest on November 6, 1964, James Seale essentially confessed to kidnapping and murdering Dee and Moore, but indicated "I'm not going to admit it; you are going to have to prove it."

- After the charges were dropped against James Seale and Marcus Edwards, Sheriff Hutto assisted James Seale in preparing affidavits in support of a writ against Mississippi Highway Patrol Officer Ford O'Neal for allegedly assaulting Seale at the time of his arrest.

- On March 4, 1966, Sheriff Hutto told FBI agents that he had no information as to James Seale's whereabouts, though ten (10) months later, he campaigned to run for Sheriff of Franklin County.

- It was politically expedient for public officials to be members of the Ku Klux Klan.

---

[26] See the Mississippi Department of Archives and History Website, accessed at  http://mdah.state.ms.us.
[27] At his deposition, Mr. Moore also admitted to gaining possession of these documents in July of 2005 after having received them from local reporter Jerry Mitchell.  (See Exhibit "E" to Motion for Summary Judgment, at pp. 75-77).

## *Application of Timeline to this Case*

Throughout this litigation, the Plaintiffs have provided moving targets – alternate dates in 2007 – for the accrual of their claims.[28]   The purpose of presenting this timeline to the Court is simple.   The timeline demonstrates how any information gleaned in 2007 is irrelevant to the issue of accrual since the Plaintiffs were in actual or constructive possession of the information used to plead the operative facts in this case as early as the 1960's and no later than July of 2005.

One must also view this timeline with the understanding that the Plaintiffs have not conducted the requisite diligent inquiry in this case.   In a newspaper article chronicling his recent investigative efforts, Thomas Moore concedes that he only began to investigate his brother's death in 1998.   (Donna Ladd, *I Want Justice, Too*, Jackson Free Press, July 20, 2005, attached as Exhibit "T" in support of the Motion for Summary Judgment).[29]   The family of Henry Dee made no discernable investigative efforts prior to this lawsuit.   (See Exhibit "K" to Motion for Summary Judgment, Collins Deposition, at pp. 36-38).   This lack of effort places constructive awareness of all information that a diligent inquiry would have revealed upon the Plaintiffs. Therefore, it is clear that the Plaintiffs have long possessed the requisite awareness of the operative bases for their allegations.

The Plaintiffs cannot overcome their actual and constructive awareness through mere claims of fraud and/or equitable tolling.   In the absence of diligent inquiry, the Plaintiffs cannot argue to this Court that any acts of the Defendant affected their actual or constructive possession

---

[28] In the various versions of their Complaint, the Plaintiffs have alleged an accrual date of January 24, 2007 – the date that they first alleged Sheriff Hutto was named as an unindicted co-conspirator and Marcus Edwards provided certain Grand Jury testimony.   (See Complaint, Doc. No. 1 on ECF System; First Draft of Proposed Amended Complaint, Doc. No. 215-2 on ECF System; Second Draft of Proposed Amended Complaint, Doc. No. 220 on ECF System; and the Response).   However, in discovery, the Plaintiffs conceded that they had no proof to support these allegations, indicating that they would rely upon Marcus Edwards' June 5, 2007 trial testimony as the date of accrual.   (See the Plaintiffs' Discovery Responses, attached as Exhibit "P" in support of the Defendant's Motion for Summary Judgment).   However, in their Complaints, the Plaintiffs stick to January 24, 2007 as the date of accrual.

[29] Accessible at http://www.jacksonfreepress.com/index.php/site/comments/I_want_justice_too.

of the information upon which they base their allegations.  Even if the Plaintiffs were able to prove efforts at concealment, such efforts do not compromise the application of the statute of limitations.  Clearly, by July of 2005 – **at the latest** – the Plaintiffs possessed the operative information upon which they would base their suit.

Indeed, on July 17, 2005, Plaintiff Thomas Moore stood in front of the Roxie First Baptist Church, the site of the very search he claims is probative of the Defendant's liability, and proclaimed his intentions.  Asked to speak, he stated:

> *Now, you may ask 'well, why are you doing it now? Why are you coming back to seek justice?' ... I served this country for 30 years and 15 days. ... I have the right to be here.  Because I am going to hold Franklin County and the State of Mississippi accountable for the deaths of Charles Eddie Moore and Henry Dee.*

(Donna Ladd, *I Want Justice, Too*, <u>Jackson Free Press</u>, July 20, 2005, attached as Exhibit "T" in support of the Motion for Summary Judgment).  Clearly, on July 17, 2005, the Plaintiffs had enough information to assert that the Defendant was accountable for the deaths of Dee and Moore.  All the Defendant asks is that this Court hold the Plaintiffs accountable for this knowledge, which clearly proves that the statute of limitations ran by August 5, 2008 – the date that the Plaintiffs finally – after all these many years – brought this action.

### G.  The Doctrine of Laches also Applies as a Basis for Summary Judgment.

The Plaintiffs main justification for ignoring the doctrine of laches is their contention that this is a purely legal action.  However, this Court is not restrained from providing such equitable relief as the Plaintiffs suggest.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002) (holding that doctrine of laches could apply as bar to civil rights action).  Regardless, by invoking the equitable power of this Court in an attempt to toll the statute of limitations, the Plaintiffs have purposefully injected issues of equity into the determination of whether their claims are proper for adjudication.  The Defendants are only asking for their fair share of equity.

The Plaintiffs deny that the Defendant has been caused any prejudice relative to the past changes in law.  However, they fail to dispute the remaining prejudices to the Defendant.  The Defendant is unable to cross-examine the very "witnesses" – almost all dead – upon whose hearsay statements the Plaintiffs rely.  Similarly, the Defendant is constricted from calling fact witnesses, since nearly all are dead.  Numerous other examples are cited in the Motion for Summary Judgment and need not be repeated here.  This case is so old that the Plaintiffs are relying on actual historians to attempt to prove the specifics of their claims.

Equity does what the law, should, but is unable to do.  The legal principles surrounding the accrual of this cause of action and the application of the statute of limitations should dispose of the issue.  However, should they not, traditional notions of fair play demand that this Court discharge the Defendant from this action.

### CONCLUSION

So much has now been said by the parties in this case, and while an evidentiary hearing would be of great assistance in further clarifying the issues, further written repetition is not necessary.  The Plaintiffs have singly failed to present genuine issues of material facts to allow their claims to proceed to trial on the merits.  Alternatively, the statute of limitations bars further progression.  No matter the basis for analysis, the unavoidable result is that the Defendant is entitled to judgment as a matter of law and the Plaintiffs claims must be dismissed.

Respectfully Submitted, this the 10th day of May, 2010.

FRANKLIN COUNTY, MISSISSIPPI,
*Defendant*

BY:  Its Attorneys:

  /s/ Michael J. Wolf
MICHAEL J. WOLF

MICHAEL J. WOLF (MSB# 99406)
T. L. "SMITH" BOYKIN, III (MSB# 101256)
PAGE, KRUGER & HOLLAND, P.A.
P.O. Box 1163
Jackson, Mississippi 39215-1163
(601) 420-0333
Fax (601) 420-0033

WILLIAM J. HALFORD, JR. (MSB# 2113)
HALFORD LAW FIRM
85 Main St. West
P.O. Box 650
Meadville, MS 39653
(601) 384-2100
Fax (601) 384-2121

JAMES A. TORREY, JR. (MSB# 8251)
LANE B. REED (MSB# 10002)
MARY KATHRYN KIRKPATRICK (MSB# 103000)
MCGEHEE MCGEHEE & TORREY
Post Office Box 188
Meadville, MS 39653
(601) 384-2343
Fax (601) 384-5442

## CERTIFICATE OF SERVICE

I, the undersigned attorney for Defendant, hereby certify that I have this day caused to be served by ECF, a true and correct copy of the above and foregoing document to all counsel having previously formally appeared herein.

This the 10th day of May, 2010.

_____/s/ Michael J. Wolf_____
MICHAEL J. WOLF